**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**MIDDLE DIVISION**

FILED
02 MAR 29 PM 3:03
U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| MARSHALL VAN REED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV 00-RRA-2968-M |
| | ) | |
| CHARLES BAILEY, et.al., | ) | |
| | ) | |
| Defendants. | ) | |

ENTERED
MAR 29 2002

### MEMORANDUM OF OPINION

This is a civil action pursuant to 42 U.S.C. § 1983 in which the plaintiff, Marshall Van Reed, alleges that his constitutional rights were violated while incarcerated at St. Clair Correctional Facility in Springville, Alabama. In his *pro se* complaint, plaintiff names law librarian Charles Bailey, Sgt. John B. Sanderson, and Assistant Warden Archie Garrett as defendants. He seeks compensatory and punitive damages. In accordance with the usual practices of this Court and 28 U.S.C. § 636(b)(1), the complaint was referred to the magistrate judge for a preliminary review and recommendation. *See McCarthy v. Bronson*, 500 U.S. 136 (1991).

On November 17, 2000, the magistrate judge entered an order for special report directing that copies of the complaint in this action be forwarded to defendants Bailey, Sanderson, and Garrett and requesting that they file a special report responding to the factual allegations of the complaint. On January 24, 2001, the defendants filed their special report attaching pertinent documents and an affidavit. On February 14, 2001, plaintiff filed a response to the defendants' special report. By order of February 15, 2001, the parties were notified that the special report filed by the defendants would be construed as a motion for summary judgment, and the plaintiff was notified that he had twenty (20) days from the entry date of the order to respond to said motion for summary judgment.



Plaintiff also received instructions from the magistrate judge regarding the provisions and consequences of Rule 56 of the *Federal Rules of Civil Procedure*. The plaintiff failed to timely respond to the magistrate judge's order. However, the Court shall consider the plaintiff's February 14, 2001, response to the defendants' special report as a timely objection to the motion for summary judgment.

## FACTUAL ALLEGATIONS

Plaintiff complains that the defendants (1) violated his right to due process of law at two disciplinary hearings, (2) failed to protect him against the actions of other defendant officers who (3) retaliated against him because he was pursuing a civil lawsuit against another corrections officer by (a) finding him guilty of two (2) fraudulent disciplinary infractions, (b) subjecting him to cruel and unusual punishment, (c) hindering his access to court and law library materials, and (d) destroying his personal legal and religious documents.

Applying summary judgment standards to the evidence before the Court, the following facts appear to be undisputed or, if disputed, have been taken in a light most favorable to the plaintiff. Because the facts are complicated and voluminous, the court shall first summarize all of the allegations presented by the plaintiff within this subsection. Thereafter, those allegations which are pertinent to the constitutional issues alleged by the plaintiff shall be explored in more detail.

### *Summary*

Between March 7, 2000, and October 22, 2000, the plaintiff was charged with, pled guilty to, or was found guilty of, nine disciplinary violations. Gay Affidavit (Exhibits to Document # 12) at 1-9. Six of the plaintiff's violations were for indecent exposure, one was for possession of pills,

one was for possession of a knife, and one was for destroying state property (e.g. cutting pages out of a law book). *Id.* As punishment for each disciplinary, plaintiff received varying degrees of disciplinary segregation (between 25 and 45 days), loss of store, phone, and visitation privileges, and one referral for custody review and reclassification. *Id.* Plaintiff expresses constitutional concerns for only three of the disciplinary infractions. First, plaintiff is disgruntled with due process deficiencies at a disciplinary hearing (Document # 1, at 7) for behavior which is alleged to have occurred on March 7, 2000. Second, he protests due process deficiencies and the validity of a disciplinary infraction he received for possession of a knife which is alleged to have occurred on or about August 22, 2000. *Id.* at 8-9. Third, he attacks due process deficiencies and the validity of another disciplinary he received for destruction of a law library book which is alleged to have occurred on or about October 11, 2000. *Id.* at 11.

Prior to and during the term of his confinement in disciplinary segregation, plaintiff was also actively pursuing a civil lawsuit (Document # 1) against Corrections Officer Kenneth Pierce. Because of this lawsuit, plaintiff contends defendants Bailey and Sanderson brought forth two fraudulent disciplinary actions against him, defendant Sanderson subjected him to cruel and unusual punishment by placing him in a "dead man cell," defendants Sanderson and Bailey denied him legal books, and defendant Sanderson destroyed his personal legal and religious material. *Id.* Finally, plaintiff contends that Assistant Warden Garrett failed to protect him from the wrongful actions of Sanderson and Bailey. *Id.*

## I. DISCIPLINARY INFRACTIONS

### A. March 7, 2000 - Indecent Exposure - Due process violations.

In his complaint (Document # 1), plaintiff alleges that, on March 7, 2000, he was placed inside an administrative segregation cell "under an (sic) 72 hours investigation for violation of Rule

3

#38" of Administrative Regulation #403. *Id.* at 7. During processing, Sgt. Sanderson told the plaintiff, "If you don't drop your complaints against my officer, I'm going to make you suffer as long as your back here in seg. (sic)."[1] Immediately thereafter, plaintiff was placed in disciplinary segregation by order of Sgt. Sanderson without first being served with notice of any official disciplinary violation. *Plaintiff's Complaint* and ( Document #15 at 6). The record reflects that plaintiff was charged with a violation of Rule #38 at 7:10 am on March 10, 2000, for an act which was alleged to have occurred on March 7, 2000, at 9:20 a.m. Plaintiff pled guilty to this violation on March 14, 2000, at 8:15 a.m. Gay affidavit (Exhibits to Document # 12) at 1.

Plaintiff remained in disciplinary segregation for approximately five (5) months because he accumulated three more disciplinary infractions for indecent exposure.[2] Plaintiff contends Sgt. Sanderson retaliated against him by placing him in an upstairs segregation cell where he could see female officers because Sgt. Sanderson knew he had a "masturbation illness."(Document # 15 at 8). While in segregation plaintiff received "many threats by [Sanderson.]" *Id.*

**B. August 22, 2000 - Possession of a knife - Due process violations and false disciplinary infraction.**

On August 22, 2000, plaintiff was in the "walk-yard" when defendant Sanderson approached, "scandalized the plaintiff's name, laughed and stated the plaintiff was about going to get (45) more days in disciplinary segregation because a knife had been found by Officer Cedric Bothwell in the

---

[1] In his affidavit attached to the defendants' Special Report, Sgt. Sanderson attests that all of the plaintiff's allegations "are false." Sanderson affidavit (Document # 12) at 1. He states that the plaintiff remained in disciplinary segregation because of his numerous infractions, not because he was retaliating against the plaintiff for the pursuit of civil lawsuit. *Id.*

[2] Plaintiff does not contest the validity of these disciplinary infractions.

plaintiff's cell. *Id.* and (Document # 1, at 3). Sanderson then asked the plaintiff if he was "ready to cooperate." (Document # 15 at 8). On August 26, 2000, plaintiff was charged (Document # 1, at 7-8) with possession of contraband ( e.g. knife), but was not tried on that charge until September 5, 2000. Plaintiff contends Administrative Regulation #403 mandates that he be charged and tried within a 10 day time period. Therefore, his due process rights were violated. *Id.* and (Exhibit E to Document # 15, at 10).   The disciplinary board found the plaintiff guilty of the infraction on September 5, 2000.[3]  Plaintiff denies he ever possessed any weapon in his cell and therefore the disciplinary must be false.

### C. October 11, 2000 - Destruction of library book - Due process violation and false disciplinary infraction.

On October 5, 2000, plaintiff contends defendant Charles Bailey, law library supervisor, threatened to bring a "bogus" disciplinary charge against the plaintiff charging the plaintiff with destruction of a lawbook  because the plaintiff refused to drop his lawsuit against Officer Pierce.[4] (Document # 15, at 3). On October 11, 2000, the plaintiff received a disciplinary for same. *Id.* at 4. Plaintiff contends he had another inmate look at the particular book and  the inmate found no pages missing. *Id.*  Defendant Bailey was present at a disciplinary hearing which took place on October 12, 2000, wherein Sgt. Sanderson asked the plaintiff if he was "ready to cooperate and get out of disciplinary seg. and be release[d] to population." *Id.* Plaintiff stated he would not drop his lawsuit. Sanderson replied,  ". . . take his ass back to the cell. As [plaintiff] was walking out of the door Sgt. Sanderson stated you got 45 and 45, meaning 45 days loss of all privileges and 45 days disciplinary

---

[3] Gay affidavit (Exhibits to Document # 12) at 6.

[4] Defendant Bailey contends that "the allegations [of retaliation] made by the plaintiff are false." (Document # 12, Bailey Affidavit at 1).

segregation.".  *Id.* Sgt. Sanderson did not presented (sic) or asked any of my questions nor given me an opportunity to []prove my innocen[ce] all because of my lawsuit . . . ." (Exhibit E to Document # 15) at 14.

### D. Disciplinary Review

Plaintiff contends he served 261 days straight in disciplinary segregation without a review of his sentence by the disciplinary board and that other similarly situated inmates' sentences were reduced when his were not. (Document # 15, at 10) Plaintiff made no such allegations in his original complaint and as such, these allegations will not be considered by this Court.

## II.    CRUEL AND UNUSUAL PUNISHMENT

On September 3, 2000, Sgt. Sanderson "entered another threat in making my seg. (sic) time harder if I'm not ready to drop my complaints against . . . Pierce. About 10 maybe 15 minutes later 2-officers come to my cell and told me to pack up." (Document # 1 at 7).  Plaintiff was moved to a cell known as the "dead man cell."[5]  Plaintiff describes the conditions in the "dead man cell" as follows:

> The cell contained filthiness and inhuman condition. There was blood stains all over the mat that the plaintiff had to sleep on.[6] There was blood stains on the walls, floor, and sink. There was ants and other insects amonged (sic) the cell. The heater did not work. The air condition was (sic) inadequate[7]....  There was no ventilation circulating, the sink water constantly running...when the inmate in cell (5) [flushed] his toilet, it back up into cell

---

[6] *Id.* at 8. Sgt. Sanderson denies the existence of a "dead man's cell," (Document # 15, at 8) contending that all disciplinary segregation cells are the same. Defendant Sanderson states the plaintiff was moved from an upstairs cell where he could see female officers, to a downstairs cell where he could not see female officers because the plaintiff would not stop exposing himself to female officers. *Id.*

[6] Plaintiff alleged in his original complaint that he had no mat to sleep on. (Document # 1, at 8).

[7] Plaintiff alleged in his original complaint that the air did not work. *Id.*

(6) toilet. The cell contained a very bad odorant [sic]. The cell door window was missing. The cell out-door window was complete[ly] sealed with a steel plate. The concrete slab which substituted for the bed have 2-steel beams in the center of the concrete slab, one on each end for restraining purpose. The plaintiff showed the officers the condition of the cell and asked for some cleaning supplies and was total (sic) ignored." (Document # 15, at 9).

Plaintiff also contends that only one of the two lights in his cell is operational and he has been afforded no deodorant, shampoo, condition and lotion. Further, there is no hot water and he is only allowed to shower three times per week with water that is "below 30% degree". Finally, he has "received numerous breakfast tray[s] marked with a black marker infested with different kinds of inspects (sic) and completely cold food...."(Document # 1, at 8).

## IV. DESTRUCTION OF PERSONAL LEGAL AND RELIGIOUS DOCUMENTS

Plaintiff contends that while in disciplinary segregation, several times he requested copies of a trial transcript, prosecutor's brief, closing arguments, and testimony regarding biological evidence in connection with his criminal conviction so that he could send them to Barry Scheck's Innocence Project at Cardozo Law School, but the requests were denied. (Document # 15, at 10). On October 11, 2000, plaintiff attended a disciplinary segregation board hearing "to discuss why he [was] denied . . . some of his personal property. On said date, he was approved to enter the property room for legal documents." Upon entering the property room, "plaintiff first acknowledged his transcript, prosecutor brief, as well as many other of his legal papers and his religious books and materials w[ere] missing....Officer Gladden said he believed...Sgt. Sanderson . . . destroyed [the plaintiff's] legal papers and religious materials."[8]

_____

[8] _Id._ at 10 and 11. Defendant Sanderson denies he deprived the plaintiff of any materials from the law library and that he deprived the plaintiff of any of the plaintiff's personal legal materials. _Id._ Defendant states that plaintiff was allowed to receive his personal legal materials on March 22, 2000, and March 29, 2000, and was allowed to have "all of his stored paperwork on October 11, 2000. (Document # 12, at 2). In support thereof, defendant Sanderson points to three property release forms which he purports to be plaintiff's admission that plaintiff received all of his personal legal documents from the property room. Gay affidavit (Exhibits to Document # 12) at 11-14.

## V. ACCESS TO COURT AND LAW LIBRARY MATERIALS

Defendant Bailey's affidavit tends to show plaintiff was receiving at least one law book and numerous paper supplies every three days from March 7, 2000 through October, 2000.   Bailey affidavit (Document # 12 ) at 1-4.   Plaintiff contends that he only received approximately one-third (1/3) of the books and law materials listed by defendant Bailey.[9] Plaintiff relates that on October 2, 2000, when plaintiff received only one law book after requesting two,  he asked defendant Bailey why he was shorted a book. (Document # 1, at 9). Bailey responded,  "I was told not to give you the one book so be thankful....[and] [i]f you don't drop your complaints, you won't be getting no books."[10]  Finally, on October 11, 2000,  plaintiff states he was denied law books again and that this time defendant Bailey told him, "You will be denied law books until you cooperate with officials, you know what you need to do." (Document # 1, at 10).

## VI.  FAILURE TO PROTECT

Plaintiff contends that he informed Assistant Warden Garrett many times by way of letter and twice in person about the treatment he was receiving from defendants Bailey and Sanderson.[11] Plaintiff attached copies of the correspondence sent to Warden Garrett. (Exhibits A-E to Document

---

[9]  (Document # 15, at 3). Defendant Bailey shows a voluminous list of legal materials he attests were given to the plaintiff between March 7, 2000, and November 20, 2000. *Id*. at 3-4.

[10]  *Id*. In his response to the defendants' special report (Document # 15, at 3-5), plaintiff also makes claims that the law books have pages torn from them and  Officer Charles Bailey, the library supervisor, is untrained, incompetent and only acts in his capacity to hinder inmates' legal efforts. However, these claims were not stated in the plaintiff's original complaint and therefore will not be considered by this Court.

[11]  (Document # 15, at 11-12). Assistant Warden Garrett specifically denies having a conversation with the plaintiff about complaints filed by the plaintiff against officers. Garrett affidavit (Exhibits to Document #12) at 3.  He also denies that he refused to respond to correspondence he received by from the plaintiff concerning  officers but does not state what his response was, if any. *Id*. Finally, he attests that plaintiff's status in disciplinary segregation was reviewed several times by the review board at the plaintiff's request.  *Id*.

# 15) at 1-17. Only that correspondence which specifically relates to the present action is set out below.[12]

### Correspondence

1. August 18, 1999- wherein plaintiff contends Officer Pierce assaulted him. (Exhibit C, at 5).

2. March 7, 2000 - wherein plaintiff contends his due process rights were violated because he remained in disciplinary segregation for more than 72 hours before being charged with a disciplinary violation. Plaintiff also registered a complaint against Sgt. Sanderson stating that Sanderson informed plaintiff that he would make the plaintiff's segregation time harder unless he dropped his lawsuit against Officer Pierce. (Exhibit D, at 6).

3. March 12, April 3, May 31, July 28, and August 21, 2000 - wherein plaintiff complains that Sgt. Sanderson continued to threaten him if he did not drop his lawsuit against Officer Pierce. (Exhibit E, at 7-11).

4. July 31, 2000 - Plaintiff requests to be considered for release from disciplinary segregation on the basis he has seen doctors for his masturbation illness. (Exhibit E, at 16).

5. August 22, 2000 - wherein plaintiff contends that he is going to be falsely charged with having a knife in his cell and that in conjunction with this false charge, Sgt. Sanderson laughed about the disciplinary and potential criminal charge, stating, "Are you ready to cooperate?" (Exhibit E, at 12).

6. September 5, 2000 - wherein plaintiff contends that he was served a disciplinary for the knife incident on August 26, 2000, but was not tried on said charge until September 5, 2000, in violation of his right to due process of law because Administrative Regulation #403 mandates that he be charged and tried within 10 days. (Exhibit E, at 13).

7. October 12, 2000 - wherein plaintiff contends that he was denied law books by law clerk Charles Bailey because of his refusal to drop his complaint against Officer Pierce. Further, that Charles Bailey caused a false disciplinary to be filed against the plaintiff for cutting pages out of a law book. Finally, plaintiff contends at his disciplinary hearing for same, Sgt. Sanderson again asked him if he was ready to cooperate. (Exhibit E, at 14).

8. February 3, 2001 - plaintiff contends unknown officers refused to allow him to carry his legal paperwork to court in his lawsuit against Kenneth Pierce. Further, plaintiff contends

---

[12] While other correspondence is relevant to show that plaintiff did notify Warden Garrett when he was perceived that he was being treated unfairly, it is not material with regard to any claims and defendants in the present action.

Officer Gladden returned plaintiff's personal property to him in a sheet. When Officer Gladden requested the plaintiff sign a property release form, plaintiff asked if all his legal materials were in the sheet. Twice Gladden answered yes so plaintiff signed the property release. Plaintiff later opened the sheet and his legal books, letters and personal letters were missing. (Exhibit E, at 15).

<u>Conversations</u>

Plaintiff avers that on September 5, 2000 (Document # 15, at 12), he spoke personally with Assistant Warden Garrett about his complaints and the lack of response by the Warden to the complaints. Plaintiff contends the Warden responded by stating, "Drop your complaints against my officer and I will see what I can do for you." *Id.* Plaintiff saw defendant Garrett a second time on September 21, 2000, and attempted to voice the same complaints to him but "Mr. Garrett cutted (sic) into and said, 'There is nothing he can do until I drop my complaints' and walked off." (Document # 1, at 9).

### *PREAMBLE*

The Court will assess plaintiff's Retaliation, Due Process, Cruel and Unusual Punishment, Destruction of Legal and Religious Property, Access to Court, First Amendment, and Failure to Protect claims in the preceding chronological fashion because retaliation claims must be attached to constitutionally protected conduct (even though the underlying retaliatory acts giving rise to the claim do not have to be constitutional deprivations in and of themselves). In short, a determination that there has been no deprivation of the plaintiff's constitutionally protected rights or conduct necessarily abrogates the existence of any retaliation claims. Therefore, it is logical to create a reference point for the legal theory behind retaliation prior to discussing same as it may be applied to plaintiff's alleged constitutional violations.

Further, it is recognized that plaintiff maintains some defendants should be held responsible for the alleged constitutional violations against him predicated upon supervisory liability. While "the doctrine of respondeat superior does not apply to § 1983 cases, a § 1983 plaintiff may maintain a theory of direct liability against a prison or other official if that official fails to properly train, supervise, direct, or control the actions of a subordinate who causes the injury." *Pearl v. Dobbs*, 649 F.2d 608, 609 (8th Cir. 1981).

> To prove a supervisory liability claim, the plaintiff must demonstrate that prisoners face a pervasive and unreasonable risk of harm from some specified source and that the supervisor's corrective inaction amounts to deliberate indifference or "'tacit authorization of the offensive [practices].'" *Slakan v. Porter*, 737 F.2d 368, 373 (4th Cir. 1984), *cert. denied*, 470 U.S. 1035, 105 S.Ct. 1413, 84 L.Ed.2d 796 (1985) (quoting *Orpiano v. Johnson*, 632 F.2d 1096, 1101 (4th Cir. 1980), *cert. denied*, 450 U.S. 929, 101 S.Ct. 1387, 67 L.Ed.2d 361 (1981)).

*Williams v. Willits*, 853 F.2d 586, 588 (8th Cir. 1988). "A single incident, or isolated incidents, do not ordinarily satisfy this burden." *Id.* In this action, if a defendant's motion for summary judgment is due to be granted or denied based upon their supervisory capacity, that will be specifically noted.

As a final preliminary matter, it is acknowledged that defendants: (1) deny all of plaintiff's material allegations, (2) deny that plaintiff's constitutional rights have been violated, (3) assert qualified immunity, and (4) assert respondeat superior. (Document # 12, at 2-3).

## RETALIATION

It is well settled that "an act in retaliation for the exercise of a constitutionally protected right is actionable under Section 1983 even if the act, when taken for different reasons, would have been proper." *Howland v. Kilquist*, 833 F.2d 639, 644 (7th Cir. 1987). It has been recognized, however,

11

"that claims by prisoners that particular administrative decisions have been made for retaliatory purposes are prone to abuse." *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983). Consequently, "[c]laims alleging retaliation must be factual and mere conclusory allegations of unconstitutional retaliation will not suffice." *Adams v. James*, 797 F. Supp. 940, 947 (M.D. Fla. 1992). "Recognizing that the ultimate fact of retaliation for the exercise of a constitutionally protected right rarely can be supported with direct evidence of intent that can be pleaded in a complaint, courts have found sufficient complaints that allege a chronology of events from which retaliation may be inferred." *Benson v. Cady*, 761 F.2d 335, 342 (7th Cir. 1985). *See also Black v. Lane*, 22 F.3d 1395, 1399 (7th Cir. 1994); *Geder v. Godinez*, 875 F. Supp. 1334, 1338 (N.D. Ill. 1995).

Within this "chronology of events," a plaintiff must (1) "show that his conduct was constitutionally protected" and (2) demonstrate that his conduct in exercising a protected right was a "motivating factor" behind defendants' actions against him. *Mount Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). Once plaintiff has established these two elements, the burden shifts to defendants to show by a preponderance of the evidence that the same action would have been taken had plaintiff not engaged in the protected activity. *Id.* A prisoner's claim of retaliation is not precluded merely because the disciplinary against him was overturned or disallowed on appeal. *See Jones v. Coughlin*, 45 F.3d 677 (2d Cir. 1995); *Franco v. Kelly*, 854 F.2d 584 (2d Cir. 1988); *Sprouse v. Babcock*, 870 F.2d 450 (8th Cir. 1989).

Plaintiff argues the defendants retaliated against him for asserting his constitutional right to be free from cruel and unusual punishment and for exercising his constitutional right to protected speech. Finally, the following actions, while they are not constitutional violations in and of themselves, are actionable under § 1983 because plaintiff contends that the motivating factor behind the actions was to punish the plaintiff for exercising his constitutional rights: (1) the initiation and

12

finding guilt for three disciplinary infractions, (2) placement in disciplinary segregation numerous times under reprehensible conditions, and (4) threats by the defendants.

## DUE PROCESS

Plaintiff argues that the three (3) disciplinary infractions outlined herein above violated his right to due process of law because the infractions were either procedurally deficient, completely false, or both.  As punishment for each disciplinary, plaintiff received varying degrees of disciplinary segregation (between 25 and 45 days), loss of store, phone, privileges, visitation privileges, and one referral for custody review and reclassification.

"It is well established that the due process clause is only triggered by the deprivation of a protected [liberty] interest." *Pierce v. King*, 918 F. Supp. 932, 943 (E.D. N.C. 1996). In almost all instances, a determination that the plaintiff has a liberty interest in the punishment he was given is a threshold question which must be answered in the affirmative before a procedural due process claim becomes viable. If this question is answered in the negative, no further inquiry is required. However, allegations that a disciplinary action, although procedurally sound, is essentially a product of admitted lies or deception, mandate further study even if a liberty interest is not implicated in the punishment meted out against an inmate. In those cases, the court must determine whether the disciplinary process itself was conducted in such an 'arbitrary and capricious' manner that substantive due process has been implicated.

In the present action, plaintiff contends that his right to due process of law was violated by the defendants when they failed to follow procedural safeguards mandated by the Department of Corrections' Administrative Regulations regarding the prosecution of disciplinary infractions and/or

13

because the infractions themselves were the result of malicious lies created by the defendants.   In the discussion below, this court shall determine whether the plaintiff's procedural and/or substantive due process rights were violated.

### Procedural Due Process

*Administrative and Disciplinary Segregation*

The Supreme Court in *Sandin v. Conner* explained that while no freestanding constitutional liberty interest exists in  disciplinary or administrative segregation, state law, under certain circumstances, can create a liberty interest  protected by the Due Process Clause in the context of "disciplinary changes in a prisoner's conditions of confinement...." [13]  Those state created interests would be "limited to freedom[s] from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, *nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life*."[14] (emphasis added) In applying this standard to the inmate's case in *Sandin*, the Court found that 30 days disciplinary segregation  was not an atypical or significant hardship from the plaintiff's ordinary conditions of incarceration in the Hawaii prison system.  As such, the inmate's segregation did not amount to a grievous loss  protected by the Due Process Clause.

After the Supreme Court's decision in *Sandin*, a review of disciplinary segregation in the Alabama prison system  drew the conclusion that segregation is generally "not a dramatic departure from the ordinary conditions of confinement nor is it a 'major disruption in [an Alabama prisoners']

---

[13] *Williams v. Fountain*, 77 F.3d 372, 374 n.3 (11th Cir. 1996) (*citing Sandin v. Conner*, 515 U.S. 472, 115 S. Ct. 2293, 132 L. Ed. 2d 418 (1995)). See also *Garlington v. Haley*, 2001 WL 530451, at 4, ----F.Supp.---- (S.D. Ala. 2001).

[14] *Id.*

environment.'"[15]  The Eleventh Circuit also adhered to *Sandin's* precedent by reviewing whether a liberty interest has been created on a case by case basis.  For instance, in *Williams v. Fountain,*[16] the Court presumed the plaintiff suffered a liberty deprivation and was entitled to due process because Williams was placed in solitary confinement for one year.  By contrast, in *Rogers v. Singletary,*[17] the same Court determined that two months placement in administrative segregation did not represent the atypical and significant hardship envisioned by *Sandin.*

In the present case, plaintiff was placed in disciplinary segregation for successive disciplinary infractions ranging from (25) to (45) days per infraction.  Neither the term nor the conditions of his confinement implicates a liberty interest. Therefore, because the plaintiff has not proven he has a liberty interest in  disciplinary segregation,  neither the lack of due process nor any deficiency in procedure actually used is actionable under the Fourteenth Amendment or § 1983.

*Loss of Store, Visitation and Telephone Privileges*

"Inasmuch as confinement to disciplinary segregation has been held by the Supreme Court to be a type of discipline that should be expected by an inmate as incident to his criminal sentence, losing store, phone and visitation privileges is a form of discipline that should be expected by an inmate as well . . . . [L]oss of privileges is not 'an atypical and significant hardship...in relation to the ordinary incidents of prison life.'"[18]  Therefore, because the plaintiff has not proven he has a

---

[15]  See *infra*, ftnte 3. Citation taken from *Boglin v. Weaver*, 2001 WL 228172, 5, ----F.Supp.---- (S.D. Ala. 2001) citing *Sandin*, 515 U.S. at 486.

[16]  See *infra*, ftnte 3.

[17]  142 F.3d 1252, 1253 (11th Cir. 1998).

[18]  *Anderson v. Jones*, 1999 WL 1565203, 9, ----F.Supp. ---- (S.D.Ala. 1999), *affirmed* 245 F.3d 795 (11th Cir. (Ala.) 2000). (citations omitted).

liberty interest in the above privileges, neither the lack of due process nor any deficiency in procedure actually used is actionable under the Fourteenth Amendment or § 1983.

*Eligibility to Transfer and Upgrade in Custody*

To the extent that plaintiff is alleging that the defendants referred his case to the custody review board for a potential upgrade in custody without affording him due process, his claim must fail. "[T]he Due Process Clause in and of itself [does not] protect a duly convicted prisoner against transfer from one institution to another within the state system." *Meachum v. Fano*, 427 U.S. 215, 225, 96 S.Ct. 2532, 2538 (1976). Nor does it protect a convicted prisoner when he is transferred interstate. *Olim v. Wakinekona*, 461 U.S. 238, 103 S.Ct. 1741 (1983).[19] Additionally, "[i]nmates have neither a protectable property nor liberty interest in custodial classification." *Mikeska v. Collins,* 900 F.2d 833, 836 (5th Cir. 1990). A change in level of custody within a prison system does not infringe upon or implicate a liberty interest within the meaning of the due process clause. *United States v. Williams,* 787 F.2d 1182, 1184 n.3 (7th Cir. 1986)(citing *Moody v. Daggett,* 429 U.S. 78, 87-89 (1976) and *Meachum v. Fano*, 427 U.S. 215 (1976). Therefore, because the plaintiff has not proven he has a liberty interest in his ability to transfer or custodial status, neither the lack of due process nor any deficiency in procedure actually used is actionable under the Fourteenth Amendment or § 1983.

In conclusion, since the plaintiff has no liberty interest in disciplinary or administrative segregation, remaining in a particular institution or classification, or the aforementioned privileges, he has failed to establish a claim against any of the defendants pursuant to the Fourteenth

---

[19] The rationale utilized in both *Meachum* and *Wakinekona* was confirmed by the Supreme Court again in *Sandin v. Connor*, 515 U.S. 472, 483, 115 S.Ct. 2293, 2300 (1995).

Amendment's Due Process Clause to the United States Constitution. Accordingly, for the reasons stated above, this action is due to be dismissed, and summary judgment is due to be granted in favor of defendants Garrett

## **Substantive Due Process**

Prison authorities may not use information which they know to be false to [punish an inmate.] *Monroe v. Thigpen*, 932 F.2d 1437, 1441-42 (11th Cir. 1991). In *Monroe v. Thigpen*, prison officers used admittedly false information to classify the plaintiff as a sex offender, thereby making him ineligible to participate in work release programs. Inmate Monroe was convicted of the murder of Linda Ann Harden. The presentence investigation report ("PSI") in Monroe's institutional file indicated that he had raped Ms. Hardin prior to killing her and that he had admitted this fact to the parole officer who prepared the PSI. Based on this information, Monroe was classified as a sex offender and was denied work release. Monroe wrote to the Board of Pardons and Paroles stating that the information contained in the PSI was false and requesting that the PSI be corrected. Although the Board of Pardons and Paroles determined that the information was, in fact, false, it refused to correct the erroneous statements. The Eleventh Circuit Court of Appeals held that Monroe's due process rights had been violated by the use of *admittedly* false information to classify Monroe as a sex offender and to deny him parole. 932 F.2d at 1441-42. The court made it clear that it was the *knowing* use of the false information that was the gravamen of defendants' actions.

There has been no admission by any of the defendants in this case that they intentionally caused or participated in creating false disciplinary infractions against the plaintiff in order to mar his prison record. "[W]here, as here, the question is not the use of admittedly false information by

17

the [defendants], but whether the information was in fact false, there is simply no federal cause of action." *James v. Robinson*, 863 F. Supp. 275, 278 (E.D. Va.), *aff'd*, 45 F.3d 426 (4th Cir. 1994) (Table). This claim is therefore due to be dismissed, and summary judgment is due to be granted in favor of defendants Garrett, Sanderson and Bailey.

## CONDITIONS OF CONFINEMENT

Conditions of confinement claims by convicted prisoners are governed by the eighth amendment proscription against cruel and unusual punishment. *Bell v. Wolfish*, 441 U.S. 520 (1979). In order to establish an eighth amendment violation, a plaintiff "must prove three elements: (1) a condition of confinement that inflicted unnecessary pain or suffering [constituting cruel and unusual punishment], *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981), (2) the defendant[s'] 'deliberate indifference' to that condition, *Wilson v. Seiter*, [502] U.S. [294, 303], 111 S.Ct. 2321, 2327, 115 L.Ed.2d 271 (1991), and (3) causation, *Williams v. Bennett*, 689 F.2d 1389-90 (11th Cir. 1982)." *LaMarca v. Turner*, 995 F.2d 1526, 1535 (11th Cir. 1993) (footnotes omitted), *cert. denied*, 510 U.S. 1164 (1994). Whether a particular condition of confinement constituted cruel and unusual punishment is an objective inquiry; whether prison officials were deliberately indifferent to that condition is a subjective inquiry. *See Wilson v. Seiter*, 502 U.S. at 290.

Prison conditions amount to cruel and unusual punishment only when they result in "unquestioned and serious deprivation of basic human needs." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). While it is the duty of prison officials to furnish prisoners with "reasonably adequate" food, clothing, shelter, and sanitation, *Newman v. Alabama*, 559 F.2d 283, 286 (5th Cir. 1977), *rev'd in part on other grounds*, 438 U.S. 781 (1978), the Constitution "does not mandate comfortable

18

prisons," *Rhodes v. Chapman*, 452 U.S. at 349.  As the Eleventh Circuit Court of Appeals observed

in *Newman*: "[T]he Constitution does not require that prisoners be provided any and every amenity

which some person may think is needed to avoid mental, physical, and emotional deterioration."

559 F.2d at 291.

> [C]onditions that cannot be said to be cruel and unusual under contemporary
> standards are not unconstitutional.  To the extent that such conditions are restrictive
> and even harsh, they are part of the penalty that criminal offenders pay for their
> offenses against society.

*Rhodes v. Chapman*, 452 U.S. at 347.

"To be deliberately indifferent, a prison official must knowingly or recklessly disregard an

inmate's basic needs." *LaMarca v. Turner*, 995 F.2d at 1535.  In order to establish that an official

was deliberately indifferent, "a plaintiff must prove that the official possessed knowledge both of

the infirm condition and of the means to cure that condition, 'so that a conscious, culpable refusal

to prevent the harm can be inferred from the defendant's failure to prevent it.'" *Id.* at 1535 (*quoting*

*Duckworth v. Franzen*, 780 F.2d 645, 653 (7th Cir. 1985), *cert. denied*, 479 U.S. 816 (1986)).

*Accord Farmer v. Brennan*, 511 U.S. 825, 835-36, 114 S.Ct. 1970, 1979 (1994).

After reviewing the plaintiff's alleged conditions of confinement, the only conditions which

are of constitutional import are plaintiff's complaints regarding blood stains covering his cell.

However, while plaintiff states that he requested cleaning supplies from "officers," and was denied

access to same, he does not report the names of any officers that he reported any concerns to about

the conditions of his cell.  The plaintiff has failed to prove any defendant was deliberately indifferent

to his plight.  As such, plaintiff's claims regarding the condition of his cell are due to be denied and

the motion for summary judgment filed in behalf of defendants Sanderson, Bailey and Garrett is due

to be granted.

## LOSS OF PROPERTY

Plaintiff complains that defendant Sanderson destroyed his legal and religious materials, thus depriving him of said property.  In *Hudson v. Palmer*, 468 U.S. 517, 533 (1984), the Supreme Court stated:

> We hold that an unauthorized, intentional deprivation of property by a state employee does not constitute a violation of the due process requirements of the Fourteenth Amendment if a meaningful post deprivation remedy for the loss is available.

Plaintiff has not been deprived of property without due process of law because he has a legal means whereby he can be heard on this claim for compensation.  The post-deprivation remedies available to the plaintiff under Alabama tort law are sufficient to satisfy due process under *Parratt* and *Hudson.  See Parratt*, 451 U.S. at 543; *Hudson,* 468 U.S. at 534-35.  Consequently, plaintiff's constitutional claims against defendant Sanderson for destruction of his legal and religious property are due to be dismissed.


## ACCESS TO COURT

Plaintiff contends defendant  Bailey violated his first and fourteenth amendment right to access to court by refusing to give plaintiff all the legal books and materials requested by the plaintiff.

### *First Amendment*

The Supreme Court in *Shaw v. Murphy,* stated that  "[i]nmates retain . . . certain protections of the First Amendment . . . nonetheless, . . . the constitutional rights that prisoners possess are more limited in scope than the constitutional rights held by individuals in society at large. In the First Amendment context, for instance, some rights are simply inconsistent with the status of a prisoner or 'with the legitimate penological objectives of the corrections system.' "  532 U.S. 223, 121 S.Ct.

1475, 1478, 149 L.Ed.2d 420 (2001). (other citations omitted)  Having said that, "restrictions on inmate-to-inmate communications pass constitutional muster only if the restrictions are reasonably related to legitimate and neutral government objectives." *Shaw*, 532 U.S. 223  (citing *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d (1987)).

There are four factors which must be considered when applying the above standard to a prison regulation. "First, [the] regulation must have a logical connection to legitimate penological interests invoked to justify it." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 350 (1987). Second, the court must consider whether "'alternative means of exercising the right . . . remain open to prison inmates.'" *Id*. at 351 (*quoting Turner v. Safley*, 482 U.S. at 89). The Court must also examine "the impact that accommodation of [plaintiff's] asserted right would have on other inmates, on prison personnel, and on allocation of prison resources generally." *O'Lone v. Estate of Shabazz*, 482 U.S. at 352. Finally, the Court must ascertain whether an obvious, easy alternative to the current regulation exists, and, if such an alternative exists, whether that alternative can be implemented at a *de minimis* cost to valid penological interests. *Turner*, 482 U.S. at 90-91.

The defendant's policy of bringing law materials to inmates in disciplinary segregation is reasonably related to a legitimate, neutral governmental interest.  Plaintiff is afforded an alternate route to access the court because he is allowed to request and have delivered to him legal materials while in segregated confinement. While the prison could allow inmates in disciplinary segregation to physically visit the law library themselves, that would defeat the purpose of placing the inmate in disciplinary segregation. This is a discretionary function of the prison system upon which this Court will not impede.  The Court has reviewed the voluminous amount of legal  materials alleged to have been provided to the plaintiff by defendant Bailey. Even if, as plaintiff alleges, he received only one-third of this material, the Court does not find that either plaintiff's first  amendment right

21

to access to court was violated.  As such, summary judgment is due to be granted in favor of defendant Bailey, and the plaintiff's first amendment access to court claim is due to be dismissed.

### *Fourteenth Amendment*

The due process clause of the fourteenth amendment provides another potential foundation for plaintiff's assertion that he has been denied access to court while in disciplinary segregation. However, the right of access to court as defined in *Bounds v. Smith*, 430 U.S. 817 (1977), requires only that inmates be provided with some reasonable means by which they may bring their legal claims before the Court.  This can be accomplished by one of several alternatives, including the appointment of counsel, providing the assistance of other persons trained in the law, or providing access to a law library.  It must be emphasized that these are all *alternative* ways of guaranteeing a prisoner's right of access to the court; they are not cumulative of one another. [20]

In *Lewis v. Casey*, the Supreme Court re-analyzed *Bounds* and set forth the following principles:  (1) there is no free-standing right to a law library or legal assistance, only a right to access to court [21];  (2) the scope of this 'access to court' is not intended for all types of lawsuits: it is only to provide tools for grappling with attacks on sentences, directly or collaterally, and to challenge conditions of confinement [22];  (3) although *Bounds* did not specifically state that in order to have standing a plaintiff must satisfy an "actual injury" requirement, said requirement is a fundamental constitutional prerequisite [23];  and  (4) assuming the plaintiff does have standing,

---

[20] *See Lewis v. Casey*, 518 U.S. 343, 350, 116 S.Ct. 2174, 2180 (1996); *Bounds v. Smith*, 430 U.S. at 830.

[21] *Id.* at 350-351.

[22] *Id.* at 355.

[23] *Id.* at 349.

*Bounds* must be interpreted in conjunction with *Turner v. Safley*, which states that a prison regulation impinging on inmates' constitutional rights "is valid if it is reasonably related to legitimate penological objectives. [24]"

While the phrase 'access to court' in has been defined in (1) and (2) as either appointment of counsel, the assistance of other persons trained in the law, or access to a law library in connection with direct or collateral attacks on sentences and conditions of confinement cases, the question of how to define the "actual injury" prerequisite in (3) requires more elaboration.

An analysis of actual injury in access to court cases necessarily involves entwining the nature of the claim itself as set out in (1) and (2) with a determination of whether that claim is actionable. *Lewis* defined "actual injury" as those who have suffered or will imminently suffer, actual harm.[25] To determine whether there is or will be actual harm is a two part test: first, are there adequate legal resources available and second, does plaintiff have an actionable claim?

*"Adequate" means "Capable"*

In *Lewis,* the Arizona Department of Corrections (ADOC) attempted to state that their constitutional burden was met when they provided an excellent law library and law clerks. The Supreme Court said that the ADOC's position misinterpreted *Bounds* in that *Bounds* "guarantees no methodology but rather the conferral of a capability - - the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts."[26] This is the touchstone. As such, when any inmate "shows that an actionable claim of this nature which he desired to bring

---

[24] *Id.* at 362 (citing *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)).

[25] *Id.* at 349.

[26] *Id.* at 355.

has been lost or rejected, or that presentation of the claim is currently being prevented, " . . . . his

lack of capability demonstrates the failure to furnish adequate libraries or adequate legal help. [27]

*"Actionable claim"*

In finding that only non-frivolous claims are actionable claims, the majority in *Lewis* held

that "[d]epriving someone of an arguable (though not yet established claim) inflicts actual injury

because it deprives [a plaintiff] of something of value - arguable claims are settled, bought and sold.

Depriving someone of a frivolous claim, on the other hand, deprives him of nothing at all, except

perhaps the punishment of Federal Rule of Civil Procedure 11 sanctions."[28]

The Eleventh Circuit has adopted the above standard, explaining:

> With respect to access-to-court claims, *Lewis* clarifies that a plaintiff first must show
> actual injury before seeking relief under *Bounds*. *See Bass v. Singletary*, 143 F.3d
> 1442, 1444 (11th Cir.1998). This essential standing requirement means that prison
> officials' actions that allegedly violate an inmate's right of access to the courts must
> have impeded the inmate's pursuit of a nonfrivolous, post-conviction claim or civil
> rights action. *See id.* at 1445. To prevail, a plaintiff must provide evidence of such
> deterrence, such as a denial or dismissal of a direct appeal, habeas petition, or civil
> rights case that results from actions of prison officials. *See id.* at 1446. Therefore,
> in an access-to-courts claim, "a plaintiff cannot merely allege a denial of access to
> a law library or adequate attorney, even if the denial is systemic." *Sabers v. Delano*,
> 100 F.3d 82, 84 (8th Cir.1996) (per curiam). Rather, a plaintiff must demonstrate
> that the lack of a law library or inadequate access to counsel hindered his "efforts to
> proceed with a legal claim in a criminal appeal, postconviction matter, or civil rights
> action seeking to vindicate basic constitutional rights." *Id.*

*Wilson v. Blankenship*, 163 F. 3d 1284, 1290-91 (11th Cir. 1998).

This Court has carefully applied the principles of *Lewis* and its progeny to the case at hand

and has determined that the plaintiff lacks standing. In doing so, the Court recognizes that a plaintiff

---

[27] *Id.*

[28] *Id.* at 353 and ftnte 3.

does not have a free-standing constitutional right to a law library or legal assistance. As such, he cannot establish "relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense. . . . [he] must go one step further and demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim. "[29]

The particular genre of the underlying action that plaintiff seeks to pursue, a post-conviction remedy, is the type of action envisioned by *Lewis*. However, plaintiff has failed to demonstrate that the actions of defendant Bailey in implementing the library system for inmates in disciplinary segregation have caused or will imminently cause him to suffer actual harm because he has not shown his present access to the court is inadequate and he has not articulated an actionable claim.

Even if a plaintiff survives the threshold question of standing, the constitutional right of access to court that plaintiff is afforded in prison is limited by his status as an inmate. Even so, when the government seeks to limit this right, it must have a rational and legitimate penological reason for doing so. The Court finds the prison's library policy is neutral and that the reasons for the restrictions on the plaintiff's personal access to the library are related to a legitimate penological interest in accordance with *Turner v. Safley* requirements.[30]   Therefore, plaintiff's claims that the actions of defendant Bailey violated his right to due process of law are due to be dismissed.

Plaintiff also complains that the destruction of his legal paperwork has effectively precluded him from presenting materials to his desired attorney, Barry Scheck, for the purpose of seeking a reversal of his conviction. However, the materials listed by the plaintiff are materials which should

---

[29]  *Id.* at 351.

[30]  For expanded discussion of *Turner v. Safley*, please see 'First Amendment' section *infra,* pages 5-6.

remain as part of the permanent record in the state court file in which they are stored, and copies of that should be readily available to the plaintiff upon request. Further, plaintiff has failed to demonstrate that he has an actionable claim. While he informed the court that he desires to pursue a Rule 32 petition, he has failed to inform the court of any details regarding or alleged errors which resulted in his underlying conviction. It is incumbent upon the court to determine whether or not the plaintiff's underlying Rule 32 claim is a nonfrivolous claim. The plaintiff has not "demonstrated that his Rule 32 petition is nonfrivolous" and, as such, his claims are due to be dismissed for failing to state a claim upon which relief may be granted. *Lee v. Jones,* 2001 WL 102364, 3, — F.Supp.— (S.D. Ala. 2001).

## FREEDOM OF SPEECH

The First Amendment right to free speech, in concert with the First Amendment right to petition the government for redress of grievances, enables a prisoner to file a grievance within the prison. *See Wildberger v. Bracknell*, 869 F.2d 1467, 1468 (11th Cir. 1989). It is well settled that "an act in retaliation for the exercise of a constitutionally protected right is actionable under Section 1983 even if the act, when taken for different reasons, would have been proper." *Howland v. Kilquist*, 833 F.2d 639, 644 (7th Cir. 1987).

There is no question that plaintiff engaged in constitutionally protected conduct when he filed a civil lawsuit against Officer Pierce. Further, his verbal and written complaints addressed to defendant Garrett concerning his treatment at St. Clair Correctional Facility are constitutionally protected. Plaintiff has shown adequate evidence that defendants Sanderson and Bailey were retaliating against him for exercising his right to free speech and that retaliation was the

motivating factor behind many of the actions taken against him by defendants Sanderson and Bailey during the time period about which he complains.

Both Sanderson and Bailey specifically informed the plaintiff many times that actions taken against the plaintiff were in retaliation for plaintiff's lawsuit against Officer Pierce. Defendant Sanderson told the plaintiff that he would heighten any punishment the plaintiff received as a result of any disciplinary action, and participated in the creation of one allegedly false disciplinary infraction  related to possession of a knife. Sanderson also destroyed the plaintiff's legal and religious property. Defendant Bailey  withheld library books from the plaintiff and  initiated a false disciplinary action against the plaintiff because of plaintiff's refusal to dismiss the lawsuit against Pierce.  The chronology of events as set out by the plaintiff creates a factual dispute as to whether Sanderson and Bailey were retaliating against the plaintiff because he exercised his right to freedom of speech.

## SUPERVISORY LIABILITY

Plaintiff maintains that defendant Garrett should be held responsible for the alleged constitutional violations against him  predicated upon supervisory liability.[31] While "the doctrine of respondeat superior does not apply to § 1983 cases, a § 1983 plaintiff may maintain a theory of direct liability against a prison or other official if that official fails to properly train, supervise, direct, or control the actions of a subordinate who causes the injury." *Pearl v. Dobbs*, 649 F.2d 608, 609 (8th Cir. 1981).

> To prove a supervisory liability claim, the plaintiff must demonstrate that prisoners face a pervasive and unreasonable risk of harm from some specified source

---

[31]   These are plaintiff's claims against Warden Garrett.

and that the supervisor's corrective inaction amounts to deliberate indifference or
"'tacit authorization of the offensive [practices].'" *Slakan v. Porter*, 737 F.2d 368,
373 (4th Cir. 1984), *cert. denied*, 470 U.S. 1035, 105 S.Ct. 1413, 84 L.Ed.2d 796
(1985) (quoting *Orpiano v. Johnson*, 632 F.2d 1096, 1101 (4th Cir. 1980), *cert.
denied*, 450 U.S. 929, 101 S.Ct. 13887, 67 L.Ed.2d 361 (1981)).

*Williams v. Willits*, 853 F.2d 586, 588 (8th Cir. 1988).  "A single incident, or isolated incidents, do

not ordinarily satisfy this burden."  *Id.*

In this case, the underlying facts set out in support of plaintiff's retaliation claims provide

a basis for allowing claims based upon supervisory liability for these reasons:  (1) plaintiff must

engage in  a  recitation of specific incidents which cover a period of time in order to show

intentional retaliation, and (2) supervisory liability requires allegations of  widespread and

continuing abuse, factors which can be satisfied by supporting facts of a conspiracy or retaliation

claim, provided plaintiff shows that the supervisory defendants have actual knowledge of those

facts.

Defendant Garrett was well aware of the plaintiff's complaints as evidenced by numerous

letters and two verbal conversations between him and the plaintiff.  Nevertheless, Garrett refused

to help the plaintiff, condoned the actions of Sanderson and Bailey, and tacitly assisted them in their

revenge against the plaintiff by telling the plaintiff he would not help him unless the plaintiff

dismissed his lawsuit against Pierce.  Plaintiff creates a factual dispute as to whether defendant

Garrett failed to protect him from Bailey and Sanderson.

## CONCLUSION

For the reasons stated above, the motion for summary judgment filed by the defendants

Sanderson, Bailey, and Garrett is  due to be DENIED IN PART and GRANTED IN PART as

follows:

1.  there are no genuine issues of material facts with regard to the plaintiff's Due Process claims against defendants Sanderson, Bailey, and Garrett in connection with three disciplinary infractions. Accordingly, the motion for summary judgment filed by defendants Sanderson, Bailey, and Garrett with regard to said due process claims is due to be GRANTED, and said claims are due to be DISMISSED WITH PREJUDICE;

2.  there are no genuine issues of material facts with regard to the plaintiff's Cruel and Unusual Punishment claims against defendants Sanderson, Bailey, and Garrett in connection with the conditions of his confinement in disciplinary segregation.  Accordingly, the motion for summary judgment filed by defendants Sanderson, Bailey, and Garrett with regard to said cruel and unusual punishment claims is  due to be GRANTED, and said claims are due to be DISMISSED WITH PREJUDICE;

3.  there are no genuine issues of material facts with regard to the plaintiff's Destruction of Property claims against defendants Sanderson and Garrett in connection with the loss of his legal and religious materials.  Accordingly, the motion for summary judgment filed by defendants Sanderson and Garrett with regard to said destruction of property claims is due to be GRANTED, and said claims are due to be DISMISSED WITH PREJUDICE;

4.     there are no genuine issues of material facts with regard to the plaintiff's Access to Court claims against defendants Bailey and Garrett pursuant to the First or Fourteenth Amendment of the United States Constitution.  Accordingly, the motion for summary judgment filed by defendants Bailey and Garrett with regard to said access to court claims is  due to be GRANTED, and said claims are due to be DISMISSED WITH PREJUDICE; and

5.  that there are  genuine issues of material facts with regard to the plaintiff's Freedom of Speech claims against defendants Sanderson, Bailey, and Garrett. Accordingly, the motion for

summary judgment filed by defendants Sanderson, Bailey, and Garrett with regard to said freedom of speech claims is  due to be DENIED, and said claims are due to be REFERRED to the magistrate judge for further proceedings consistent therewith.

An order consistent with this opinion shall be entered.

DATED this _29ᵗʰ_ day of _/March_, 2002.

WILLIAM M. ACKER, JR.,
SENIOR UNITED STATES DISTRICT JUDGE